COMMONWEALTH vs. PHILLIP PENNELLATORE.

Suffolk.   March 6, 1984. — July 5, 1984.

Present: HENNESSEY, C.J., WILKINS, LIACOS, & LYNCH, JJ.

*Homicide.  Constitutional Law,* Admissions and confessions, Waiver of
constitutional rights, Confrontation of witnesses, Self-incrimination,
Separation of powers of government. *Waiver. Witness,* Self-incrimina-
tion, Immunity. *Practice, Criminal,* Sentence, Verdict. *Felony-Murder
Rule.*

A confession by a defendant charged with murder and other serious crimes
was not rendered inadmissible on the basis that police, who had given
him adequate Miranda warnings, failed to honor his request for an
attorney and to heed his attempt to terminate questioning, where the
defendant's isolated statement, "I guess I'll have to have a lawyer for
this," taken in context, was insufficient to establish either an expressed
unwillingness to continue or an affirmative request for an attorney, and
where the defendant's later request, "Can we stop please?", at which
time a break was taken and a beverage procured did not, when viewed
in context, indicate that his request was meant to be an assertion of his
right to remain silent or to stop the questioning permanently. [385-388]
In the circumstances, a judge did not err in denying a criminal defendant's
motion to extend the immunity granted to an adverse witness so as to
prevent her from refusing, on Fifth Amendment grounds, to testify
concerning certain events allegedly related to the crime. [388-390]
At the trial of indictments for first degree murder, armed robbery, and
armed assault in a dwelling with intent to commit a felony, the judge
did not err in imposing concurrent life sentences on the latter two of-
fenses, to be served from and after his mandatory sentence for first
degree murder where the jury's answers to special questions, establishing
deliberate premeditation, extreme atrocity or cruelty, and felony-murder
as separate, sufficient grounds for their verdict of first degree murder,
revealed that there had been no imposition of multiple punishment for
the same crime. [390]
At the trial of indictments charging first degree murder and other felonies,
the judge acted properly in submitting special questions to the jury which
required them to state whether any verdict of guilty of murder in the
first degree was based on the felony-murder doctrine or on the grounds
either of deliberate premeditation, or extreme atrocity or cruelty. [390-
391]

Consecutive sentences of life imprisonment for first degree murder and other serious crimes did not intrude upon the executive power of commutation. [391]

INDICTMENTS found and returned in the Superior Court Department on May 13, 1981.

A pretrial motion to suppress evidence was heard by *Roger J. Donahue*, J., and the cases were tried before *James P. Donohue*, J.

*Roger Witkin* for the defendant.

*John A. Kiernan*, Assistant District Attorney (*John N. Tramontozzi*, Assistant District Attorney, with him) for the Commonwealth.

LYNCH, J. This case and its companion[1] stem from a common incident, although each raises for the most part independent questions of law. The defendant was convicted of murder in the first degree, armed robbery, and armed assault in a dwelling with intent to commit a felony. The trial judge sentenced the defendant to concurrent life terms on the latter two convictions, to be served from and after the mandatory life term on the conviction of murder in the first degree. The victim, an eighty-four year old woman, died as a result of between fifty and sixty blows of severe force to her head which fractured her skull. Three days after the crime had been committed, the police received a telephone call from the defendant's partner in the incident, James Costello. As a result of this conversation, the police later arrested both Costello and the defendant. After being informed of his Miranda rights, the defendant confessed to the crime.

On appeal, the defendant makes several arguments. First, he contends that his confession should be suppressed because his request for an attorney was not honored and his attempt to terminate questioning was not heeded. Second, the defendant argues that his motion to compel immunization of an adverse witness, Donna Westbrooks, should have been allowed so as to prevent her from refusing to testify on Fifth Amendment

[1] *Commonwealth* v. *Costello, post* 393 (1984).

grounds about certain events allegedly related to the crime. Finally, the defendant objects to the sentences imposed by the judge. He argues that, since his conviction of murder in the first degree was based in part upon a felony-murder theory, additional, consecutive sentences for the underlying felonies cannot be properly imposed. Further, the defendant maintains that the sentences imposed effectively forestall the potential for commutation by the Governor, and in this respect they constitute an impermissible judicial intrusion into an executive function. Finally, the defendant requests us to exercise our power under G. L. c. 278, § 33E, to direct the entry of a verdict of a lesser degree of guilt or to restructure the sentences received. We decline to exercise our power under G. L. c. 278, § 33E, and we affirm the judgments below.

There was evidence from which the jury could have concluded the following. In March and April of 1981, the second-floor apartment of Donna Westbrooks on Hyde Park Avenue in Boston was occupied at various times by Westbrooks, the defendant, Costello, and a number of other individuals, most of whom were youths of junior high school or high school age. The victim lived alone upstairs in a third-floor apartment. On March 30, Westbrooks observed that the victim owned several valuable items of jewelry, and this fact was communicated to a number of the occupants of her apartment. A subsequent plan was hatched to steal these items. On April 6, 1981, Westbrooks and Costello went to the victim's apartment, ostensibly for a visit. They were invited in and served orange juice by the victim. Costello rose from the table in order to put the glasses in the sink. He then walked up behind the victim, removed a length of heavy black telephone cable from his sleeve, and struck the victim several times with the cable on the back of her head.

Westbrooks returned to her apartment and told the defendant that Costello needed his assistance. By her account, the defendant asked, "What happened? . . . Did he hit her yet?" The defendant ran upstairs and saw the victim lying on the kitchen floor screaming in pain. As the victim began to rise up from the floor, the defendant took the cable and by his account struck

the victim fifty or sixty times until she lay motionless on the floor.

The defendant and Costello then proceeded to steal items from the victim's apartment. Just prior to their departure, they noticed that the victim was still alive. An attempt was then made to suffocate her with a pillow, and her face was struck several times with a hammer. Finally, her wrist was slit, and the defendant and Costello departed.

1. As noted above, the defendant confessed to the crime, and the circumstances of this confession are now contested on appeal. The details of the confession merit close examination. After the defendant and Costello were arrested by police, Miranda warnings were read to the defendant both on the way to the police station and again at his booking on arrival. After listening to the latter warnings, the defendant stated that he understood them, and he declined an offer to use the telephone. Some minutes after the defendant's arrival at the police station, while he was awaiting interrogation by a member of the homicide unit of the police force, the booking officer, who had administered the second set of Miranda warnings, spoke further with the defendant. After the officer indicated to the defendant that he was in some difficulty, the defendant said, "I guess I'll have to have a lawyer for this." The officer responded, "Yes, you will. All of these charges are very serious." The officer then suggested that the defendant use the telephone to call his family, and when the defendant refused to do this the officer offered to call the defendant's family himself. The defendant again refused.

About twenty minutes later, the defendant was taken to the detectives' room to speak with an officer from the homicide unit. Again, he was informed of his Miranda rights. The defendant indicated that he understood these rights, and expressed a willingness to speak with the detectives. The defendant gave a tape-recorded statement to the detectives, in the course of which he described the incident in some detail and confessed to his participation. At one particularly emotional point during the questioning, the defendant requested that the interrogation stop and apparently a short break was taken in order to get the

defendant a can of soda. The questioning then resumed, with the defendant again indicating a willingness to proceed.

The defendant argues that his confession should have been excluded from evidence at trial on two basic grounds. First, he contends that his reference to a lawyer at the time of his booking constituted a request for a lawyer and there should have been no subsequent questioning without one present. In addition, the defendant contends here for the first time that questioning should not have resumed after he said, "Can we stop please?", at which time a break was taken and the can of soda procured.

Regarding the defendant's first argument, the judge found that the defendant never manifested an unwillingness to talk nor did he ever affirmatively request an attorney. Further, the judge determined that the defendant's tape-recorded confession was given absent any duress or coercion. The judge found that at the time of his confession the defendant was sober, that he understood the questions posed to him, and that for the most part he answered them in a calm and articulate manner.

It has long been beyond dispute that "an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation." *Miranda* v. *Arizona,* 384 U.S. 436, 471 (1966). Further, once such "warnings have been given [as they were in the instant case] the subsequent procedure is clear: If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. . . . The rule is that the defendant's decision to cut off questioning must be 'scrupulously honored.'" *Commonwealth* v. *Brant,* 380 Mass. 876, 882, cert. denied, 449 U.S. 1004 (1980), quoting *Miranda* v. *Arizona, supra* at 479.

A criminal defendant may choose to waive his right to an attorney during interrogation. It is true that "'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights," *Commonwealth* v. *White,* 374 Mass. 132, 137 (1977), aff'd, 439 U.S. 280 (1978), quoting *Johnson* v. *Zerbst,* 304 U.S. 458, 464 (1938). However, this natural pre-

dilection must yield to the well established principle of appellate review that where, as here, there has been a determination by a trial judge that a voluntary waiver was made, "the judge's subsidiary findings will not be disturbed, if they are warranted by the evidence, and his resolution of conflicting testimony will be accepted." *Commonwealth* v. *Tavares,* 385 Mass. 140, 144-145, cert. denied, 457 U.S. 1137 (1982), quoting *Commonwealth* v. *Santo,* 375 Mass. 299, 303 (1978). See *Commonwealth* v. *Tabor,* 376 Mass. 811, 822 (1978); *Commonwealth* v. *Murphy,* 362 Mass. 542, 550 (1972) (Hennessey, J., concurring). "Such findings as to intelligent and voluntary waiver, or the absence thereof, are entitled to substantial deference by this court." *Commonwealth* v. *White, supra* at 138.

The finding that the defendant voluntarily waived his right to have an attorney present during questioning satisfies this standard. The defendant's isolated statement, "I guess I'll have to have a lawyer for this," when viewed in context, appears to be an acknowledgment of the serious nature of the charges facing him, directed in response to the police officer's comment regarding the crimes listed on the booking sheet, rather than a request for an attorney during interrogation. For the rule of *Miranda* regarding the termination of questioning to apply, there must be either an expressed unwillingness to continue or an affirmative request for an attorney. See, e.g., *Commonwealth* v. *Bradshaw,* 385 Mass. 244, 263 (1982). Contrast *Commonwealth* v. *Watkins,* 375 Mass. 472, 484 (1978). Here there was neither. Despite the booking officer's repeated efforts to urge the defendant to telephone someone for assistance, he steadfastly refused.

The defendant's solitary request to halt the questioning at a point later on must be interpreted in the context of his willingness to talk both immediately prior to and subsequent to the break. While "a defendant has not only the right to remain silent from the beginning but also a continuing right to cut off, at any time, any questioning . . . , he must 'indicat[e] in [some] manner' that he is invoking the right he previously waived." *Commonwealth* v. *Bradshaw,* 385 Mass. 244, 265 (1982), quoting *Miranda, supra* at 473-474. There is no indication on

the record that the defendant's request to stop was meant to be an assertion of his right to remain silent or to stop the questioning permanently. The record shows that throughout the dialogue the defendant had a full understanding of his rights and chose voluntarily not to exercise them. Neither under constitutional principles nor in the interests of justice are we compelled to suppress the defendant's confession, and we decline to do so.

2. The defendant raises a second argument that he was denied his right under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights to confront an adverse witness and his Fourteenth Amendment right to due process by the trial judge's denial of his motion to compel extended immunization of defense witness Donna Westbrooks. It will be recalled that Westbrooks initially accompanied Costello up to the victim's apartment, and then ran downstairs to alert the defendant that Costello had struck the victim and needed assistance. Westbrooks was given immunity by the prosecution regarding her actions on the day of the murder, April 6, and the defendant took extensive advantage of this in effectively "cross-examining" her as a hostile witness. However, the defendant urged that this grant of immunity be extended to cover Westbrooks' activities on March 30, the date of an earlier break-in of the victim's apartment, purportedly to show that Westbrooks was the motivating force behind the subsequent robbery and murder of the victim the following week. When the defendant did attempt to question Westbrooks regarding her participation in the break-in on March 30, she asserted her Fifth Amendment right to remain silent.

There was no error in the judge's denial of the defendant's motion to compel an extended immunization for Westbrooks. It has long been understood that "the right to confront and to cross-examine [witnesses] is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Chambers* v. *Mississippi,* 410 U.S. 284, 295 (1973). We have previously held that the Fifth Amendment privilege against self-incrimination is one of these legitimate interests. *Commonwealth* v. *Francis,* 375 Mass.

211, 214, cert. denied, 439 U.S. 872 (1978). In *Francis,* we rejected "the defendant's contention that we should attempt to 'balance' his rights under the Sixth Amendment against his witness's decision to invoke the Fifth Amendment. Rather, we examine[d] the record only to determine the propriety of the witness's refusal to testify on Fifth Amendment grounds." *Id.* at 215. The standard we applied was one clearly enunciated many years ago by the United States Supreme Court in *Hoffman* v. *United States,* 341 U.S. 479 (1951), that a witness's decision not to testify on Fifth Amendment grounds must be honored unless it is "'*perfectly clear,* from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have such tendency' to incriminate" (emphasis in original). *Hoffman, supra* at 488, quoting *Temple* v. *Commonwealth,* 75 Va. 892, 898 (1881), cited with approval *Counselman* v. *Hitchcock,* 142 U.S. 547, 579-580 (1892).

Westbrooks' refusal to testify regarding her role in the March 30 burglary clearly falls within this benchmark. The fact that she did waive her testimonial privilege regarding the April 6 robbery and murder is of no moment, nor is her decision to enter a guilty plea for a lesser offense arising out of the incident. "Pleading guilty to a crime does not waive the privilege not to incriminate oneself at other times in other crimes, any more than conviction of one crime erases the privilege as it relates to others." *United States* v. *Johnson,* 488 F.2d 1206, 1209-1210 (1st Cir. 1973). See *Commonwealth* v. *Francis, supra* at 217. Although, as we acknowledged in *Commonwealth* v. *Curtis,* 388 Mass. 637 (1983), "the assertion by a witness of his Fifth Amendment right may in some cases hinder a defendant's ability to present his most effective defense," we determined that the question "whether to seek a grant of immunity from the prosecution for a witness primarily involves public interest considerations best evaluated by the prosecutor." *Id.* at 645-646.

Here, the defendant's case was not measurably affected by his inability to cross-examine Westbrooks about the prior burglary. The defendant was given free rein to cross-examine

Westbrooks in detail regarding her role in the April 6 murder, for which she was given immunity. This testimony showed that she was an active participant in the planning and carrying out of the robbery and at least an accessory to the murder. Although according to the defendant's trial strategy it may have been desirable to question Westbrooks regarding other crimes committed in the past, such testimony would have had a minimal effect on the jury's evaluation of her credibility. The judge's decision to favor protection of the witness's Fifth Amendment privilege over execution of the defendant's trial strategy was justifiable. There was no error in the judge's denial of the defendant's motion to compel immunization.

3. The defendant also objects to the judge's imposition of concurrent life sentences from and after his mandatory life sentence for the first degree murder conviction. It is true that, when a jury reaches a verdict of first degree murder based on a felony-murder theory, a consecutive sentence may not then additionally be imposed for the underlying felony. *Shabazz* v. *Commonwealth,* 387 Mass. 291, 293-294 (1982). *Commonwealth* v. *Wilson,* 381 Mass. 90, 123-125 (1980). However, the jury's answers to special questions employed in this case reveal that there has been no imposition of multiple punishment for the same crime. The judge instructed the jury to determine first whether the defendant was guilty of murder in the first degree, and, if so, then to specify the grounds for their conclusion. In response, the jury found that their guilty verdict was supportable independently on *each* of the three grounds for first degree murder: deliberate premeditation; extreme atrocity or cruelty; and felony-murder. Since the jury found that two separate, sufficient grounds existed for their first degree murder finding in addition to the felony-murder ground, our decisions in *Shabazz* and *Wilson* — where the possibility existed that felony-murder was the sole basis for the finding of murder in the first degree — can therefore be distinguished.

The use of the special question format did not constitute an impermissible special verdict. We approved the use of such a device in *Commonwealth* v. *Licciardi,* 387 Mass. 670, 677 n.4 (1982), "on the ground that, without such answers, a judge

would be barred from imposing consecutive sentences for con-
viction of both murder in the first degree and any felony which
may have been the basis of that murder conviction." We went
on to observe that if a jury does find and state "that a defendant
is guilty of murder in the first degree on the ground of deliberate
premeditation or on the ground of extreme atrocity or cruelty
(or on both grounds), the fact that there was a guilty finding
on a felony charge which might have warranted, and perhaps
resulted in, a finding of guilty of murder in the first degree,
based on the felony-murder doctrine, would not foreclose con-
secutive sentences." *Id.* If anything, the use of such a verdict
slip effectively raises the burden of proof for the prosecution,
since it requires the jury not only to reach a verdict of guilty
unanimously but also to reach the same result on, at least, one
to three independent, specific grounds.

We conclude further that the imposition of consecutive sen-
tences does not represent a judicial intrusion on an executive
function (i.e., commutation of a life sentence), since G. L.
c. 279, § 8A, expressly contemplates the commencement of
a "from and after" sentence subsequent to the completion of
a previous sentence served either to the end of its term *or*
shortened by parole or commutation.[2] In addition, it would be
still open to the executive department to exercise its power of
commutation on all sentences. The judge's decision to impose
consecutive "from and after" prison terms was a proper exercise
of his sentencing power.

Finally, we decline to exercise our powers under G. L.
c. 278, § 33E, in this case to alter the result of the jury's
determinations. At the outset of this opinion, we took some
pains to develop the facts surrounding the incident, facts which
must have weighed heavily in the jurors' minds in determining
guilt and in the judge's mind in sentencing. In a case displaying

---

[2] General Laws c. 279, § 8A, inserted by St. 1924, c. 165, provides in
pertinent part: "For the purpose only of determining the time of the taking
effect of a sentence which is ordered to take effect from and after the
expiration of a previous sentence, such previous sentence shall be deemed
to have expired when a prisoner serving such previous sentence shall have
been released therefrom by parole or otherwise."

such a strong indication that the defendant is guilty of a vicious homicide without a hint of justification or excuse, we see no reason to grant the defendant's request for a verdict of a lesser degree of guilt or to disturb the sentences imposed.

*Judgments affirmed.*