Houston, J.
This action concerns personal injuries sustained by the plaintiff, Robert Douglas Powers (“Powers”), when the horse he was riding reared and fell backwards on top of him. At the time, Powers was receiving horseback riding lessons from Windhorse Dressage Academy (“WDA”) on a property in Sherborn, Massachusetts known as Woodlock Farm. Powers has brought negligence claims against Juanita Whitman (“Whitman”), a former WDA instructor, and Diana Mukpo (“Mukpo”), owner of the WDA. On June 8, 2000, the defendants filed a motion for summary judgment pursuant to Mass.R.Civ.P. 56, contending that they are shielded from liability because Powers signed a release, and because they are protected by G.L.c. 128, §2D (1991 ed. & Supp. 2000), the Massachusetts Equine Statute. For the reasons set forth below, the defendants’ motion for summary judgment is DENIED.
BACKGROUND
The summary judgment record reveals the following facts; any factual disputes that exist have been resolved in the light most favorable to Powers. The WDA is a business involved in training dressage horses, teaching horseback riding, and importing horses for sale in the United States. At all times relevant to this case, WDA was located at Woodlock Farm, a fifteen-acre property in Sherborn, Massachusetts that is owned by Arlyn and Alfred DeCicco. On the property is a large horse barn with thirty stalls, an indoor riding arena, two outdoor arenas, fifteen turn-out paddocks, and a residence where the DeCiccos live. The DeCiccos operate a licensed riding school at Woodlock Farm, and lease portions of the barn to persons who conduct their own horse-related businesses from the space they lease; WDA was one of those businesses.
WDA and the DeCiccos entered into a written lease agreement on or about May 1, 1996. The agreement provides for the lease of individual stalls by WDA for $500 per month per stall; the fee covers bedding, shavings, hay, grain, and the use of paddocks. Under the lease, however, WDA is responsible for maintenance of the stalls and care of the horses boarding in them. The lease states that Woodlock Farm will make available “arena time” and indoor as well as outdoor areas to accommodate the lesson and training requirements of the WDA, but goes on to state that Woodlock Farm “shall not charge WDA teachers a percentage of income from lessons or training.” Thus, aside from sharing the same location, Woodlock Farm and the WDA riding schools operate completely independently of each other.
In 1996, the riding school operated by the DeCiccos was licensed by the Commonwealth, as were the riding instructors they employed. WDA, however, at least as of September 1996, was not licensed as a riding school, and neither Whitman nor Mukpo were licensed as a riding teachers. Whitman and Mukpo did not become licensed until the spring of 1997.
The horse involved in this incident, Take-A-Chance, was originally brought to Woodlock Farm by his owner, Rachel Williams, in or about August or September 1996. Williams made an arrangement with Mukpo and Whitman pursuant to which they would stable the horse at Woodlock Farm, Whitman would give riding lessons to Williams, and Whitman and Mukpo could use the horse for instructional purposes with other students.
Take-A-Chance had thrown a rider on at least one prior occasion. On July 28, 1996, while Take-A-Chance was being ridden by an experienced riding instructor, the horse reared up sharply on his hind legs and fell over backwards. Fortunately, the instructor’s horsemanship skills enabled her to jump *518 off safely before the horse landed on top of her. Mukpo learned of the mishap shortly afterwards.
Several veterinary examinations of the horse conducted since 1995 revealed that the horse had arthritis in both hocks — -joints in the animal’s hind legs that correspond loosely to the human ankle. The condition caused stiffness, pain, and lameness in the horse. The horse was treated periodically for the condition with injections. In August 1996, Whitman suggested a hock injection might be in order because she believed the horse was experiencing pain and stiffness. On September 12, 1996, a veterinary examination revealed lameness on the horse’s right side. As a result, a veterinarian injected the horse’s right hock and prescribed anti-inflammatory medication for stiffness.
Beginning in June or July 1996, Powers, a novice, began taking horseback riding lessons from Whitman. Powers paid Whitman directly for the lessons. Powers separately paid Mukpo for the lease of the horse used in his lessons; the lease cost was $630 per month.
On June 22, 1996, Powers signed a release in connection with his receiving instruction at Woodlock Farm. The form Powers signed bore a logo of Woodlock Farm and referenced only Woodlock Farm in its text. The form states in relevant part as follows:
RELEASE FORM
PLEASE READ THIS DOCUMENT CAREFULLY AND DO NOT SIGN IT UNLESS YOU FULLY UNDERSTAND IT.
Student’s Name_
I recognize the inherent risks of injury involved in horseback riding generally and in learning to ride in particular. In taking lessons at Woodlock Farm, I assume any such risk of injury and further, I voluntarily release Woodlock Farm, its instructors, and agents from any responsibility on account of any injury I or my child or ward may sustain while receiving instruction or while riding in connection therewith, and I agree to indemnify and hold harmless Woodlock Farm, its instructors, and agents on account of any such claim.
-WARNING-
Under Massachusetts Law, an equine professional is not liable for an injury to, or the death of, a participant in equine activities resulting from the inherent risks of equine activities, pursuant to Chapter 128, Section 2D of the General Laws.
Student_Date_
Powers printed his name on the top line of the release form after “Student’s Name,” and signed the release on the bottom line after "Student.” On the copy of the release form in the summary judgment record, the initials “WDA” and “JW” have been handwritten near the top of the form. Powers testified in his deposition that he did not know if these initials were on the form at the time he signed it.
On September 20, 1996, Powers came to Woodlock Farm for a riding lesson with Whitman. At Whitman’s direction, he mounted Take-A-Chance. Moments after Powers mounted, the horse reared on his hind legs and fell back on top of Powers, causing him very serious hip and back injuries.
DISCUSSION
Summary judgment is appropriate when no material facts are in dispute and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Highlands Ins. Co. v. Aerovox Inc., 424 Mass. 226, 232 (1997). A moving party which does not bear the burden of proof at trial is entitled to summary judgment if it submits affirmative evidence, unmet by countervailing materials, that either negates an essential element of the nonmoving party’s case or demonstrates that the nonmoving party has no reasonable expectation of proving an essential element of its case. See Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
The court first turns its attention to the validity of the release in light of Whitman and Mukpo’s failure to obtain licenses. Concluding that only Mukpo may benefit from the release, the court then considers Mukpo’s claim that she is shielded from liability under its terms. Determining that the release language does not protect Mukpo, the court next considers Whitman’s and Mukpo’s claim of immunity under the Massachusetts Equine Statute, finally concluding that a genuine factual issue exists requiring the denial of Whitman’s and Mukpo’s motion for summary judgment.
I. Enforceability of the Release Against Unlicensed Instructors A. Juanita Whitman
Since Whitman did not obtain a license to give horseback riding lessons, she cannot benefit from the release signed by Powers. “No person shall hold himself out to be a horse riding instructor for hire without being licensed for such purpose by the commissioner.” G.L.c. 128, §2D (1991). A release may not shield a defendant from liability where the defendant has violated a statutory duty to obtain a license. See Henry v. Mansfield Beauty Academy, Inc., 353 Mass. 507, 511 (1968). In Henry, the plaintiff, who had signed a release form, sustained injuries when receiving services at a beauty school. Henry, 353 Mass. at 510. The Supreme Judicial Court ruled that the beauty school lost the protection of the release due to its violation of a statute requiring the registration of all students. Id. at 511.
Whitman contends, however, that she is an experienced instructor who has worked for many years outside of Massachusetts. Whitman contends, in essence, that her failure to obtain a license does not causally relate to Power’s injury; that he would have been injured whether or not she had obtained a license. Whitman cites to Vallone v. Donna, 49 *519 Mass.App.Ct. 330 (2000), to support her position. However, Vallone is inapposite as applied to Whitman. In Vallone, an ice skater who signed a release sustained injuries in a fall caused by a soft spot in the ice of a skating rink. Id. at 650. The skater sued the rink owners and claimed that the release was invalid because the owners had violated a state building code. Id. at 649. The Appeals Court, nonetheless, ruled that since the code in question did not relate to the maintenance of the surface of the skating rink, the release was enforceable. Id. at 650. The Appeals Court held that “violation ... of a regulation is relevant to the question of negligence only if the risk that materialized was within the contemplation of the regulation.” Id. (quoting Matteo v. Livingstone, 40 Mass.App.Ct. 658, 661 (1996)).
In this case, the risk that materialized was Powers’ injury after being thrown from a horse during a lesson conducted by Whitman. Whitman made a decision to put Powers on Take-A-Chance knowing the horse suffered from a painful medical condition. Since licensing regulations contemplate, inter alia, that the public receive safe and competent riding instruction,[2] under the reasoning in Henry and Vallone, Whitman cannot claim the protection of the release; the risk that materialized was within the contemplation of licensing regulations. In other words, since Whitman’s professional judgment was involved, and because regulations are generally tailored to ensure that decisions such as this are made only by qualified instructors, Whitman’s violation of her statutory duty precludes enforcement of the release to shield her from liability.
B. Diana Mukpo
Mukpo stands on a different footing than Whitman. As an owner of a horseback riding school, she was obligated under G.L.c. 128, §2B to obtain a license. However, the regulations in effect in 1996 for riding school operators related exclusively to ensuring the proper care of horses; the regulations do not place any responsibilities on operators to hire licensed instructors. 330 Code Mass. Regs. 16.02 (1993). Only in 1997, the year following Power’s accident, did the regulations change to require that only licensed instructors could provide riding instruction on a riding school’s premises. 330 Code Mass. Regs. 16.03(5)(b) (1997). Therefore, under Vallone, the risk that materialized was not within the contemplation of 1996 regulations pertaining to riding schools, so Mukpo, unlike Whitman, is entitled to receive any benefits afforded by the release.
II. Enforceability of the Release According to Its Terms
Originally, Powers named the DeCiccos, the owners of Woodlock Farm, as defendants in this case. However, this court allowed the DeCiccos’ motion for summary judgment on September 22, 1999. See Powers v. Mukpo, Memorandum of Decision and Order on Defendants’ Motion for Summary Judgment, (Botsford, J.) September 22, 1999 [10 Mass. L. Rptr. 535). The court determined that the release was unambiguous in its protection of the DeCiccos and that they were shielded from all liability under its terms. Id. at 7, 10. The court also commented, without fully exploring the issue, that the release might be ambiguous in its protection of Whitman and Mukpo because of the circumstances of its execution (Whitman gave Powers the release to sign, instead of a representative of Woodlock Farm), and because its language explicitly refers only to Woodlock Farm. Id. at 7 & n.9. The release explicitly extends protection to “Woodlock Farm, its instructors, and agents.” Nonetheless, neither Whitman, Mukpo, nor the WDA qualify as instructors or agents of Woodlock Farm.
Interpretation of this release, as does any contract, presents a question of law for the court to decide. See Freelander v. G&K Realty Corp., 357 Mass. 512, 516 (1970) (citing Governor Apartments, Inc. v. Carney, 342 Mass. 351 (1961)). Powers contends that the release language is clear and unambiguous; that it protects only Woodlock Farm; and that the release should be interpreted according to its plain meaning. An unambiguous contract must be enforced according to its terms. Freelander, 357 Mass. at 516. Mukpo contends that application of the release, given the circumstances under which it was executed, creates an ambiguity, and that she is entitled to summary judgment because extrinsic evidence shows that Powers intended to release Mukpo.[3] When an agreement contains ambiguous language, the court must construe it in a manner that effectuates the parties’ probable intent. See Massachusetts Mun. Wholesale Elect. Co., 411 Mass. 39, 45-46 (1991); J.A. Sullivan Corp. v. Commonwealth, 397 Mass. 789, 795 (1986). This intent can be determined by the circumstances surrounding the creation of the agreement. See Merrimack Valley Nat’l Bank v. Baird, 372 Mass. 721, 723-24 (1977). Furthermore:
When the written agreement, as applied to the subject matter, is in any respect uncertain or equivocal in meaning, all the circumstances of the parties leading to its execution may be shown for the purpose of elucidating, but not of contradicting or changing its terms . . . Expressions in our cases to the effect that evidence of circumstances can be admitted only after an ambiguity has been found on the face of the written instrument have reference to evidence offered to contradict written terms.
Keating v. Stadium Management Corp., 24 Mass.App.Ct. 246, 249-50 (1987) (quoting Robert Industries, Inc. v. Spence, 362 Mass. 751, 753-54 (1973)).
Using these principles, the first thing for the court to determine is whether an ambiguity arises when the language of the release is applied to the subject matter of this case. Once again, the release states:
*520 In taking lessons at Woodlock Farm, I assume such risk of injury and further, I voluntarily release Woodlock Farm, its instructors, and agents from any responsibility on account of any injury I . . . may sustain while receiving instruction or while riding in connection therewith, and I agree to indemnify and hold harmless Woodlock Farm, its instructors, and agents on account of any such claim.
Applying this language to Power’s riding mishap, an ambiguity arguably arises as to whether Whitman is covered because she was an “instructor” giving lessons at Woodlock Farm, although not an actual employee of the Farm. Thus, in a broad sense, Whitman could . be considered one of Woodlock Farm’s “instructors” because she gave lessons at that location. Nevertheless, this is irrelevant because, as already discussed, Whitman cannot benefit from the release because she was not licensed.
By contrast, Woodlock Farm and WDA were completely distinct; Mukpo was merely a lessee of Woodlock Farm. Neither Mukpo nor WDA was an “agent” of Woodlock Farms, even in a broad sense; thus, the release language is clear and unequivocal on this point. A contract is not ambiguous simply because litigants disagree about its interpretation. Alison H. v. Byard, 163 F.3d 2, 6 (1st Cir. 1998). Nor does the existence of the initials “WDA,” handwritten in the upper right hand corner of the document, create any ambiguity in the release’s interpretation, even if placed there prior to Power’s signing. While “Woodlock Farms, its instructors, and agents” are released under the operative text, the WDA is simply not covered. Hence, since there is no ambiguity in the release as to its coverage of Mukpo, it must be construed according to its plain meaning. Freelander, 357 Mass. at 516; Alison H. v. Byard, 163 F.3d at 6 (“Under Massachusetts law, ‘[w]here the wording of the contract is unambiguous, the contract must be enforced according to its terms’ ” (citations omitted)). Therefore, resort to extrinsic evidence is inappropriate and the contract must be construed as not including Mukpo within its terms.
Alternately, Mukpo contends that if she is not protected under the release as an actual agent of Woodlock Farms, she is protected under the doctrine of apparent authority. This contention is without merit. Under apparent authority, a principal may be held liable for the acts of another party if the principal creates an appearance that the other party is its agent. Linkage Corp. v. Trustees of Boston University, 425 Mass. 1, 16 (1997). Conversely, Mukpo argues, as an apparent agent, she should be entitled to the protection of Woodlock Farm’s release. Mukpo argues that because she is an apparent agent, she qualifies as an “agent" under the release terms and is shielded from liability. Nonetheless, even if Mukpo can be considered an apparent agent of Woodlock Farms, she cites to no case where the doctrine of apparent authority is applied in this manner. The doctrine is used to create liability on the part of a principal, not to protect an agent. See, e.g., Linkage Corp., 425 Mass. at 17. Therefore, the court declines to apply the doctrine in the fashion urged by Mukpo.
III. Whitman and Mukpo’s Potential Immunity under the Massachusetts Equine Statute
Thus far, the court has determined that Whitman is not protected by the release because she was not licensed, and that Mukpo is not protected by the release because she does not come within its terms. Whitman and Mukpo, however, look to one further source for protection: G.L.c. 128, §2D(b) (1991 ed. & Supp. 2000), the Massachusetts Equine Statute, which states in relevant part:
an equine activity sponsor, an equine professional, or any other person, which shall include a corporation or partnership, shall not be liable for an injury to or the death of a participant resulting from the inherent risks of equine activity and, except as provided in subsection (c), no participant or participant’s representative shall make any claim against, maintain an action against, or recover from an equine activity sponsor, an equine professional, or any other person for injury, loss, damage, or death of the participant resulting from any of the inherent risks of equine activities.
Thus, the statute protects “equine professionals” from suit over injuries resulting from the “inherent risks of equine activity.” An “equine professional” is defined, inter alia as “a person engaged for compensation in instructing a participant. . . for the purpose of riding.” G.L.c. 128, §2D. “Inherent risks of equine activity” include injuries resulting from the “propensity of equines to behave in ways that may result in injury, harm, or death to persons on or around them.” Id.
Although Whitman and Mukpo fall squarely within the language of this statute, their motion for summary judgment must still be denied. An exception to the statute provides that it shall not limit the liability of an equine professional, if such person “provided the equine and failed to make reasonable and prudent efforts to determine the ability of the participant to engage safely in the equine activity, and determine the ability of the participant to safely manage the particular equine based on the participant’s representations of his ability.” G.L.c. 128, §2D(c)(l)(ii). In this case, Whitman and Mukpo provided Powers, an apparent novice, an arthritic horse which had thrown a rider several months earlier. Thus, a genuine issue of material fact exists as to whether Whitman and Mukpo made “reasonable and prudent” efforts to provide Powers with an appropriate horse, based on his riding ability.
*521 ORDER
For the reasons stated above, it is hereby ORDERED that the defendants’ motion for summary judgment is DENIED.

State licensing requirements for instructors in effect in 1996 clearly contemplated protecting the public. Massachusetts regulations required applicants to furnish three references who can attest to the knowledge and skill of the applicant. See 330 Code Mass. Regs. §16.01(2)(1993). Regulations also delineate three licensing skill levels dependent on the ability of the applicant. See 330 Code Mass. Regs, at 16.01(3). Finally, applicant’s names must be published in a trade journal and comments on their qualifications solicited from the public. See 330 Code Mass. Regs, at 16.01(6). Contrast these regulations with more stringent ones currently in effect. See, e.g., 330 Code Mass. Regs. §16.02(3)(b), (c) (1997) (requiring applicants to undergo a six month apprenticeship with a licensed riding instructor and to pass a Written examination).

When Powers was asked in his deposition whether he knew who he was releasing by signing the form, he responded “I guess I don’t know. I really don’t know.” When pressed, however. Powers responded, “I guess Ibelieve[ed] I was releasing maybe almost anybody from something but not releasing them from — not completely releasing them [sic].”